UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MACY'S SYSTEMS AND TECHNOLOGY INC.,

Plaintiff,

-v-

CA, INC.,

Defendant.

25 Civ. 8530 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

In this action, the retailer Macy's Systems and Technology, Inc. ("Macy's") seeks a judicial declaration that, when it renewed in writing a licensing agreement with its software supplier in June 2025, it did so under economic duress. The supplier, CA, Inc. ("CA")—the Broadcom Inc. subsidiary previously known as Computer Associates International, Inc.—now moves to dismiss Macy's amended complaint under Federal Rule of Civil Procedure 12(b)(6).

For the following reasons, the Court grants the motion to dismiss with prejudice.

## I. Background[1]

The parties' dispute centers on Macy's renewal of a three-year agreement to license software from CA, which Macy's had licensed since 2010. Macy's contends that its contractual right to renew in 2025 unambiguously included a provision granting it a right to terminate for

[1] The Court draws the facts in this decision from Macy's Amended Complaint, Dkt. 32 ("AC"), and the agreements and email communications it attaches as exhibits or references, which are cognizable on this motion. *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."); *infra* note 7 (addressing cognizability of email strings referenced in, but not attached to, the AC). In resolving the motion to dismiss, the Court accepts the AC's well-pled factual allegations as true and draws all reasonable inferences in Macy's favor. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

convenience (a "TFC provision"); that, during the four-month period in 2025 in which the parties discussed renewal terms, CA acted in bad faith by disputing that Macy's right to renew under the governing agreement included a TFC provision; and that Macy's June 2025 execution of a renewal agreement on CA's terms, *i.e.*, without such a provision, was coerced by CA's threat otherwise to terminate Macy's software access upon the imminent expiration of the existing license. CA counters that it had an objectively reasonable basis for its reading of the agreement to exclude a TFC provision; and that, in any event, Macy's forewent alternatives—including seeking emergency relief in this District—to acceding to CA's terms.

### A. The Parties' Agreements and Course of Dealing Before 2025

Macy's, an Ohio company with a principal place of business in Georgia, is a retailer that serves 12% of the U.S. population and employs tens of thousands of people nationwide. Dkt. 32 ("AC") ¶¶ 10, 17. CA, a Delaware company with a principal place of business in California, is one of the largest providers of enterprise software solutions. *Id.* ¶¶ 2, 11.[2]

#### 1. 2010: The Licensing Relationship, Initial Subscription Agreement, and Order Form

In November 2010, Macy's began licensing CA's software under a subscription agreement. *Id.* ¶ 19. Since then, Macy's has relied on CA's software to support and optimize its mainframe systems. *Id.* ¶ 16. CA's mainframe software is embedded in nearly every aspect of Macy's operations. *Id.* ¶ 17. Macy's uses CA's software to process millions of retail transactions daily, both in store and online. *Id.* The software also plays a vital role in managing order fulfillment and inventory across Macy's stores and warehouses, managing customer and

---

[2] In materials quoted in this decision, CA is commonly referred to as "Broadcom," its parent company. *Id.* ¶ 1.

employee data, maintaining financial and accounting systems, ensuring data security, and detecting fraud in customer transactions. *Id.* ¶¶ 17–18.

In November 2010, Macy's and CA executed two documents, a subscription agreement and an order form, under which Macy's licensed CA's software for a two-year term. *Id.* ¶¶ 19–20.

***The 2010 Subscription Agreement***: The subscription agreement defined and broadly set out the terms and conditions governing Macy's license of software services from CA. *See id.* ¶ 20; *id.* Exh. A at 5–18 ("2010 Subscription Agreement"). These terms included that the license was non-transferable and non-exclusive; 2010 Subscription Agreement at 6; that the software services were for Macy's use only, *id.*; and that Macy's fees would be set out in an order form, *id.* at 9. The subscription agreement provided that either party could terminate it for cause (1) upon 30 days' written notice of a material breach if the breach remained uncured after the 30 days, or (2) if it became insolvent or if bankruptcy or receivership proceedings were under way. *Id.* at 11.[3] As to dispute resolution, the parties waived a jury trial, agreed that New York law would govern disputes, and agreed that any action would lie within the exclusive jurisdiction of the federal and state courts in the Southern District of New York. *Id.* at 12.[4]

***The 2010 Order Form***: The order form, a 1.5–page document, covered November 8, 2010 (the "Effective Date") through November 7, 2012 (the "End Date"). *See* AC Exh. A at 3–4 ("2010 Order Form"). Labeled the "On-Demand" form, it set out CA's service fees and

---

[3] An exhibit to the subscription agreement further provided that Macy's had a right to terminate in the event of three unexcused major defaults within three months, or five unexcused major defaults within 12 months. AC Exh. A at 5–18 ("2010 Subscription Agreement") at 16.

[4] The agreement also covered, *inter alia*, the parties' respective responsibilities as to service; Macy's ownership of its customer data; CA's technical support; CA's warranties and limitations on liability; the parties' mutual indemnifications and confidentiality obligations; the deadline for Macy's monthly fee payment; and CA's right to charge interest for late payment. *Id.* at 5–18.

invoicing schedule for that period. *Id.* It incorporated and attached the subscription agreement and two other forms. *Id.* at 3. Referring to itself and these attachments as, collectively, the "Agreement," it stated: "The initial term (the "Term") of the Agreement means the time period beginning as of the Effective Date and ending on the End Date." *Id.* It added:

> The provisions of this Agreement, including pricing, apply to the initial Term only. Upon any renewal, CA's then current published on-Demand offering provisions and pricing structure shall apply.

*Id.* at 4.

### 2. The 2019 Amendment

Macy's license of CA's software between 2012 and 2019 was governed by updated order forms, which generally remained governed by the terms and conditions agreed upon in 2010. AC ¶ 22.

In March 2019, the parties agreed to amend their agreement to add a right to terminate for convenience. *Id.* ¶ 23. Macy's alleges that, for it, a TFC right was a "key feature" given its "need to control its costs and switch mainframe software in the best interest of Macy's and its customers, and in light of CA's growing aggressiveness." *Id.* ¶ 24. The TFC right, Macy's alleges, enabled it to "maintain flexibility in sourcing and implementing a mainframe software solution" and "actively manage[] its costs to keep its products appropriately priced [] [i]n an era of generally rising costs." *Id.*

The one-page amendment, titled "Amendment No. 1," was effective February 1, 2019. *See id.* Exh. B ("2019 Amendment") at 2. It read, in pertinent part:

> Notwithstanding anything to the contrary in the Agreement, the following provision is added to the Agreement[5] and expressly applies to all preexisting transactions

[5] The 2019 Amendment earlier defined "Agreement" as a "certain License Agreement 349619 effective September 14, 1994." AC Exh. B ("2019 Amendment") at 2. The parties' submissions do not attach that 1994 document.

> currently in place between the parties ("Transaction Document") including the On Demand Order Form effective as of November 8, 2010.

*Id.* It added:

> Customer may terminate this Agreement together with each and all Transaction documents in effect as of the date of termination (collectively, the Agreement), without cause and without further charge or expense at any time immediately upon written notice to CA sent to usagereporting@ca.com.

*Id.* The balance of the 2019 Amendment addressed Macy's obligations to delete and return all copies of the software and CA's obligation to pay Macy's a pro-rata refund upon termination. *Id.*

### 3. The 2022 Order Form

In June 2022, the parties executed another order form governing Macy's licensing of CA's software. *Id.* ¶ 27. The six-page form, also labeled an "on demand" form, stated that it was effective June 19, 2022, and covered the three-year period ending June 18, 2025. *See id.* Exh. C ("2022 Order Form") at 2. It identified the 2010 Agreement as the "Governing Contract" with respect to the mainframe software. *Id.* It contained individual pricing and software provisions. *Id.*

The 2022 Order Form stated, on its first page: "The provisions of this document, including pricing, [apply] to the initial term only." *Id.* at 2.[6] Immediately after, it stated:

> Following the initial term, Customer [*i.e.*, Macy's] may elect to renew this Order Form as a one-time, optional three (3) year period (the "Optional Renewal") by providing CA written notice of such election on or before March 18, 2025. If Customer exercises the Optional Renewal the total fees for the Optional Renewal shall be [AMOUNT REDACTED], as stated in the table below and CA shall invoice such amount on 6/19/25.

[6] The word "apply" is omitted from the 2022 Order Form, but neither party disputes that that omission was a typographical error. *See* Dkt. 39 Exh. 3, at 5 (describing omission as a "typing error"). The corresponding provision of the 2010 Order Form uses the word "apply." AC Exh. A at 3–4 ("2010 Order Form") at 4.

*Id.* at 2. Three pages later, the 2022 Order Form included a revised TFC provision which, as stated, "replace[d] the language located in Amendment 1 effective February 1, 2019." *Id.* at 5. It read:

> Customer may terminate this Agreement provided that Customer also terminates each and all other agreements (direct or indirect or whether or not related to this Agreement) under which Customer has procured any CA offering . . . together with each and all transaction documents (or any order forms or other ordering documents) in effect between the Parties as of the date of termination . . . . Once Customer's verification [of the deletion and/or return of the software] [is] received, CA will pay Customer a pro-rata refund of any [pre-paid] License . . . fees. . . . [I]f the Agreement is terminated without cause, neither party shall have further obligations under the Agreement, except that the parties shall remain bound by the dispute resolution, choice of law [and other] obligations . . . in the Agreement.

*Id.* at 5.

### B. The Events of 2025

#### 1. Communications Between February 17 and April 9

On February 17, 2025, Shari Chung, Macy's director of technology procurement, emailed David Sak, a CA account director, with respect to a renewal. Her email stated:

> Hello David. This email serves to inform you that Macy's plans to renew our support services in accordance with our current Broadcom/CA support contract (screen shot below).
>
> ACTION REQUESTED: Please provide the renewal document for our review at your earliest convenience.

Dkt. 39 ("Reiss Decl.") Exh. 1 ("Renewal Email").[7] Beneath that message, Chung's email included—beneath the header "Current Renewal Terms Snapshot (current contract attached)"—a screenshot of the following provision from the 2022 Order Form:

---

[7] Macy's AC does not quote the Renewal Email. It synopsizes it as follows: "On February 17, 2025—well in advance of the March 18 deadline—Macy's timely exercised its renewal option by providing written notice in accordance with the terms of the 2022 Order Form, thereby making the renewal binding and effective upon notice." AC ¶ 40; *see also id.* ¶ 41 ("Macy's procurement team notified CA via email that Macy's was electing to renew the parties'

agreement for an additional three-year term" and "requested that CA provide an updated order document memorializing the renewal"). The AC thus omits the words "plans to" used by Chung.

CA submitted the Renewal Email attached to a declaration in support of its motion to dismiss, alongside copies of two other email chains the AC references. *See* Dkt. 39 ("Reiss Decl.") Exhs. 1–3. Macy's argues that these are "extrinsic communications" on which CA's motion to dismiss "improperly relies." Dkt. 49 ("Opp.") at 2. Macy's is wrong. The Court may consider the Renewal Email because the AC incorporates it by reference. *See* AC ¶¶ 40–41; *e.g.*, *DiFolco*, 622 F.3d at 111 ("Because DiFolco referred in her complaint to her e-mails to Kaplan of August 23, 2005, and August 24, 2005, the District Court could deem them incorporated in the complaint and therefore subject to consideration in its review of the adequacy of the complaint."); *Cromwell-Gibbs v. Staybridge Suite Times Square,* No. 16 Civ. 5169, 2017 WL 2684063, at *1 n.2 (S.D.N.Y. June 20, 2017) (email chain incorporated by reference where complaint made direct reference to it); *Garcia v. Dezba Asset Recovery, Inc.*, 665 F. Supp. 3d 390, 397 (S.D.N.Y. 2023) (same); *Tacon v. Cromwell*, No. 23 Civ. 8100, 2024 WL 4275625, at *2 (S.D.N.Y. Sep. 24, 2024) (email chains incorporated by reference where complaint "makes clear reference to specific emails from these chains . . . and Plaintiff clearly relied upon those emails in framing the" complaint); *Worldwide Servs., Ltd. v. Bombardier Aerospace Corp.*, No. 14 Civ. 7343, 2015 WL 5671724, at *8 (S.D.N.Y. Sep. 22, 2015) (emails incorporated by reference where "documents [were] clearly referenced by the [c]omplaint" and "highly relevant"). The same is true of the other two email chains attached to CA's declaration. *Compare* AC ¶ 42 ("Over the ensuing weeks, Macy's followed up multiple times requesting the updated renewal documentation. CA assured Macy's that it would respond shortly but failed to do so until April."), *with* Reiss Decl. Exh. 2 (emails between February 17 and April 9); *compare* AC ¶¶ 54–62 (synopsizing and summarizing email exchanges between June 10 and June 18) *and id.* Exh. D (producing last three emails in email string, dated June 17 and 25), *with* Reiss Decl. Exh. 3 (emails between June 10 and 25).

Independently, the Renewal Email is cognizable because it is "integral to the complaint." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (emphasis in original). A document is integral "where the plaintiff had to rely on [its] content 'in order to explain what the actual unlawful course of conduct was on which the [d]efendants embarked," *Garcia*, 665 F. Supp. 3d at 397 (internal citation omitted), and "no serious question as to [the documents'] authenticity [] exist[s]," *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991). The Renewal Email satisfies these requirements. Macy's claim for declaratory relief is based on its allegation that it "validly renewed the 2022 Order Form" when it provided "timely written notice of such election." AC ¶ 83, *see also id.* ¶ 40. "Plaintiffs' failure to include matters of which as pleaders they had notice and which were integral to their claim—and that they apparently most wanted to avoid—may not serve as a means of forestalling the district court's decision on [a Rule 12(b)(6)] motion." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991). Here, Macy's indisputably had notice of the Renewal Email as its sender, relied on its contents in framing the AC, and does not dispute its authenticity or accuracy. *See, e.g.*, *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (emails cognizable where "integral" to the negotiation exchange identified as the basis for the complaint); *Vogel v. TakeOne Network Corp.*, No. 22 Civ. 3991, 2023 WL 5276857, at *4 (S.D.N.Y. Aug. 16, 2023) (although "integral" exhibits are

> Following the initial term, Customer may elect to renew this Order Form as a one-time, optional three (3) year period (the "Optional Renewal" providing CA written notice of such election on or before March 18, 2025. If Customer exercises the Optional Renewal, the total fees for the Optional Renewal shall be [redacted] as stated in the table below and CA shall invoice such amount on 6/19/25.
>
> **Optional Renewal Payment Profile (USD)**

| | | | |
|---|---|---|---|
| [redacted] | | [redacted] | |
| | | | |
| | | | |
| | | | |
| | | | |

*Id.* Beneath it, Chung wrote: "Also, please ensure that the renewal contract terms are aligned with previous terms for ease of review and approvals." *Id.*

On February 18, 2025, Sak replied to Chung, confirming receipt and stating that he "will work on [her] request." Reiss Decl. Exh. 2 at 2–7 ("Feb/April Emails") at 5. Between March and April 2025, Chung twice followed up with Sak. On March 10, 2025, she wrote that she was "[c]hecking in to see how things are going with the paperwork for the Broadcom/CA renewal";

---

often formal legal documents, "communications whose legal effect forms the basis of a cause of action," including emails, "may also be considered on a motion to dismiss"). The Renewal Email is thus independently cognizable as integral to the AC. *See, e.g.*, *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (document not expressly cited in complaint "incorporated into the pleading because [it] was integral to [plaintiff's] ability to pursue" his cause of action); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (document "integral" to complaint and thus cognizable where complaint "relie[d] heavily upon its terms and effect" (internal citation omitted)); *Barshay v. Naithani*, No. 20 Civ. 8579, 2023 WL 2051170, at *6 (S.D.N.Y. Feb. 16, 2023) (considering documents that complaint did not attach because "of [its] extensive reliance on these documents").

The June email chain appended to the Reiss declaration is also cognizable for an independent reason: Macy's attached a portion of that chain to the AC. *Compare* AC Exh. D (emails between Credendino and Gressett between June 17 and June 25) *with* Reiss Decl. Exh. 3 (emails between Credendino and Gressett between June 12 and June 25). "[W]here a complaint directly refers to specific emails in an email chain, a court can consider the email chain as incorporated by reference in the complaint." *Kulick v. Gordon Prop. Grp., LLC*, No. 23 Civ. 9928, 2025 WL 448333, at *4 (S.D.N.Y. Feb. 7, 2025); *see also Maron v. Legal Aid Soc'y*, 605 F. Supp. 3d 547, 553 n.2 (S.D.N.Y. 2022) (where plaintiff conceded one email in the chain was cognizable the court deemed "it appropriate to consider the entirety of this email chain").

For the avoidance of doubt, the Court would have reached the same decision, dismissing the AC, had these email chains not been cognizable.

Sak responded that he had requested an update from his "Sales Op team and will update you as soon as I hear back from them." *Id.* at 4–5. And on March 25, 2025, she "checked back in on the requested paper-work"; the next day, CA account director Justin McWhorter responded that "[o]ur contracts team is finalizing the draft" and that he hoped to have an update by the end of the week. *Id.* at 3. On April 9, 2025, prompted by another email from Chung, McWhorter apologized for the delay and attached "executable copies" of the "renewal order form," adding: "Please review and let us know when we can schedule some time to renew." *Id.* at 2; *see also* AC ¶ 42 ("On April 9, 2025, CA finally transmitted the documentation.").

The renewal order form sent by CA ran seven pages. *See* Reiss Decl. Exh. 2, at 8–14 ("2025 Order Form").[8] McWhorter asked Chung to review the draft and let him know when the parties could "schedule some time to renew." Feb/April Emails at 2.

Salient here, the 2025 Order Form included a provision which denied Macy's a TFC right. Titled "Exclusion of Termination for Convenience," it stated:

> Customer agrees it cannot terminate this agreement . . . without cause and receive a pro-rata refund of fees not yet incurred, notwithstanding any express or implied right under any legal or equitable theory. For purposes of clarity, in the event Customer exercises any right to terminate for convenience under any other contract with Broadcom Inc., along with all its worldwide subsidiaries including CA, Inc. . . . any language in such contract requiring termination . . . shall not apply to this agreement and this agreement shall remain in full force and effect. Customer understands and agrees that any notice of termination of this agreement, other than for an uncured breach by Broadcom, shall not relieve Customer of its obligation to remit any and all remaining payment(s) contained herein and shall not give rise to any right to a refund of any amount paid hereunder.

2025 Order Form at 11.

[8] The 2025 Order Form is incorporated into the AC by reference. *See* AC ¶¶ 42 ("On April 9, 2025, CA finally transmitted the documentation."), 43 ("[I]t was materially inconsistent with the terms of the 2022 Order Form that Macy's had elected to renew."). Macy's does not contest this. *See* Opp. at 2 (contesting only incorporation of "extrinsic communications—including emails").

The 2025 Order Form also contained the following provision on its first page:

> **Offer Expiration**
>
> The pricing and terms offered herein expire unless Customer executes and delivers this Order Form to CA prior to 5 pm on the Effective Date.

*Id.* at 8 (boldface in original). The top of the first page identified the Effective Date as June 19, 2025. *Id.*

### 2. The Parties' Discussions Between April 9 and June 10

Macy's "promptly responded rejecting" the 2025 Order Form and "insisting that the 2022 Order Form and 2010 Agreement terms continue to govern." AC ¶ 46.

Between April and June 2025, Macy's and CA discussed the proposed 2025 Order Form. *Id.* ¶¶ 47–49.[9] The AC characterizes CA's communications during this period as "proposing a modified agreement and inviting further discussion." *Id.* ¶ 48. Macy's alleges that it participated in these discussions "regarding CA's proposed modifications" because, although it believed it had "already validly exercised its renewal option," it understood it was "engaged in ongoing business discussions with a long-term contractual partner concerning a potential retrade of existing terms," *id.* ¶ 49, and did not understand CA to be "refusing to honor the renewal or threatening non-performance." *Id.* The AC alleges that, during this period, CA continued to provide mainframe services to Macy's "and gave no indication that it would refuse to perform under the parties' agreement or take steps to disrupt Macy's operations." *Id.* ¶ 50.

### 3. June 10–25: CA's Allegedly Coercive Conduct and Macy's Renewal Under Protest

On Tuesday, June 10, 2025, eight days before the expiration of the 2022 Order Form, Macy's employees noticed a countdown clock embedded in its software, indicating that Macy's

[9] The AC does not attach, and neither party filed, their communications between April 10 and June 12, 2025.

access to CA's software would be revoked in eight days. *Id.* ¶ 54. Alarmed, Macy's that day "urgently contacted CA and requested temporary license keys to preserve continuity of service" while the parties resolved their dispute. *Id.* ¶ 55.

On Wednesday, June 11, 2025, CA notified Macy's that it did not acknowledge Macy's renewal of the 2022 Order Form and that Macy's access to CA's services would terminate on Wednesday, June 18 unless Macy's agreed to the terms in the proposed 2025 Order Form. *Id.* ¶ 56. According to the AC, this was the first time CA had stated that, unless Macy's executed that form, it would discontinue service upon the existing agreement's termination. *Id.*

On Friday, June 13, Macy's chief information officer, Keith Credendino, spoke with CA's vice president of Americas Strategic Sales, Randall Gressett. Reiss Decl. Exh. 3 ("June Emails") at 7–8; *see also* AC ¶ 62.

On Monday, June 16, 2025, Gressett emailed Credendino to follow up. June Emails 6–7. He wrote:

> Keith,
>
> Thank you for the time to speak on Friday. As committed during our call, we are responding to the two action items we discussed during the call regarding the stated renewal of the contract expiring this week. I worked with our team late into the day Friday to confirm both points below:
>
> Termination for Convenience—While the current agreement included the Termination for Convenience clause, the agreement also states that the provisions of this document including pricing were applicable to the initial term only. The [REDACTED] renewal price in the agreement reflects a 3 year commitment, and therefore the Termination for Convenience clause is not available for the stated renewal.
>
> Temp Keys—Our license key system and Global Support functions are tied directly to our contract system. We therefore require all contracts to be executed 48 hours before expiration along with full term Purchase Orders in order to allow sufficient time to update our contract system and have new license keys generated. We clearly communicated this to Macy's over the past 8 weeks. The renewal agreement has been with Macy's since April 8, expiring in 3 business days. I have

secured approval to extend the deadline to receive the executed agreement and PO to 5PM ET on June 18th. Temp keys are not an option. This is the latest we can accept to ensure no interruption of service and support while also preserving the negotiated renewal price.

We look forward to working with you to complete the renewal in the coming days.

Best regards,
-Randall

June Emails at 7.

Later on June 16, Credendino responded. His response read:

Although I am disappointed with the substance of your note, I appreciate your prompt follow-up to our Friday conversation. I have consulted with Macy's legal and we disagree with Broadcom's interpretation of the "Renewal Option" that was included in our 2022 Order and believe it clearly violates the plain language of our agreement.

By exercising its Renewal Option (which MST [Macy's] [sent] via a communication from Shari Chung on February 17, 2025), all of the terms of the 2022 Order are extended for three additional years as set forth therein. These terms include the "Termination for Convenience" section. In connection with an exercise of the Renewal Option, neither party is allowed to unilaterally modify terms of the 2022 Order. When we communicated that we were exercising our option, we could not claim that it was also changing the terms of the 2022 Order. Likewise, Broadcom is not allowed to respond to MST's exercise of the option by asserting that the exercise is on new terms that were not the subject of a mutual agreement.

It is disingenuous for Broadcom to argue that the removal of the Termination for Convenience is somehow not a unilateral modification of the 2022 Order and that the three year period referenced in connection with the Renewal Option was set in stone and could never be terminated. Every contract that includes a fixed term also includes various termination provisions, including, in many cases, a right to terminate early for convenience—which was clearly one of the terms of the Order Form both parties executed in 2022. Contrary to what you suggested, there is nothing in the 2022 order stating that the Termination for Convenience section only applies to the 2022 to 2025 period.

The renewal document you provided to MST has not been with Macy's for 8 weeks. Our Procurement team has indicated that it would accept the renewal document only if [it] included the same terms as the 2022 order form. We have consistently rejected Broadcom's position. We even noted that Broadcom's online master agreement terms, which are presumably available to new customers who, unlike Macy's, which has been a long-time customer that has spent millions with Broadcom, includes a right to terminate for convenience.

> As you are no doubt aware, the Broadcom software covered under the 2022 Order is critical to the operations of Macy's. While we are not necessarily looking to escalate our disagreement regarding the termination for convenience clause, if Broadcom continues to take [a] position that amounts to a breach of contract, we will have no choice but to explore all available legal options.
>
> Please let me know your thoughts on the above points. I am happy to regroup with you and/or connect your legal team with our legal team.
>
> -Keith

*Id.* at 6.

Later on June 16, CA's Gressett responded to Credendino by email:

> Thank you for getting back to me quickly and for sharing Macy's legal team's perspective. I appreciate your candor regarding your disappointment with the substance of our previous note.
>
> Regarding the "Renewal Option" in the 2022 Order, we have also consulted with Broadcom legal. While we agree that it grants Macy's the right to renew for three years at the stated price of [REDACTED], we disagree with your interpretation that all terms of the 2022 Order must be extended for the renewal period, including the "Termination for Convenience" section.
>
> The language in the 2022 Order at the bottom of page 1, specifically the provision immediately preceding the renewal clause, states that: "*The provisions of this document, including pricing [are applicable] to the initial term only*." While we acknowledge that the provision is missing the phrase "are applicable" due to a typing error, the clear intent of the provision is that the terms and conditions outlined in the 2022 Order were intended to apply solely to the initial term of the 2022 Order. Accordingly, Broadcom is not contractually obligated to extend the "Termination for Convenience" section in the 2022 Order into the renewal term. The scope of the renewal right is limited to specifying a fixed term and a stated price. Nowhere in the renewal right does it state that all other terms and conditions in the 2022 order must be extended into the renewal period. In fact, the provision cited above establishes the exact opposite.
>
> Best regards,
> -Randall

*Id.* at 5 (emphasis in original).

The AC alleges that, around this time, Macy's, in addition to requesting temporary license keys from CA, attempted to obtain access to CA's software through a third-party managed-services provider. AC ¶ 59. It alleges, "[u]pon information and belief," that CA instructed that provider not to supply the requested services to Macy's. *Id.* "CA thus intentionally foreclosed all practical avenues for Macy's to maintain continuity of software access," knowing that "Macy's entire operations depend on its mainframe systems, including CA's software." *Id.* The AC alleges that, with "only days remain[ing] before the expiration of the existing term" and "no practical ability to seek and obtain alternative or judicial relief without risking a shutdown of its operations," Macy's elected to execute the proposed order under protest. *Id.* ¶ 60.[10]

On June 17, 2025, Credendino communicated, by email to Gressett, Macy's decision to execute the 2025 Order Form under protest:

> Hi Randall:
>
> Macy's existing 2010 On Demand Order Form with Broadcom (as amended in 2019 and 2022) unambiguously provides Macy's a right to terminate for convenience. That is reinforced by the fact that Broadcom has been seeking to remove this right. Macy's exercised its right in February 2025 to extend that agreement on its existing terms (including the right to terminate for convenience) with pricing set forth in our 2022 Order Form.
>
> We are disappointed that Broadcom has ignored Macy's contractual rights and has instead leveraged pressure created by the threat of cutting off vital services without

[10] It alleges:

> For a business of Macy's scale and magnitude, it was not a realistic option to risk catastrophic disruption to its operations while pursuing rushed legal action within a matter of days. Moreover, any such disruption would have harmed Macy's consumers, who have long relied on its products, and resulted in consumers losing trust in Macy's and damaging Macy's brand. It also would have risked significant disruption to Macy's workforce.

AC ¶ 60.

> which Macy's cannot operate to try to force us to agree to narrowed termination rights. Broadcom's suspension of mainframe services would effectively shut down Macy's business, including by depriving access to our inventory and stored value payment capabilities. As a result of Broadcom's threat, we have no choice but to sign the new purchase order form, which will be sent to you shortly via our e-sign system.
>
> Just so you are aware, we have signed this new purchase order form under protest and we reserve all our rights, including the right to challenge the enforceability of the removal of the right to terminate for convenience.
>
> Please confirm as soon as possible that Broadcom will not cease operation of the mainframe.
>
> -Keith

June Emails at 4; *see also* AC ¶¶ 62 (quoting Credendino email), 63 ("Shortly thereafter, Macy's executed the agreement.").

On June 18, 2025, Gressett confirmed by email that Macy's had executed the 2025 Order Form, and that its services would not be disrupted. AC ¶ 65; June Emails at 3. His email also responded to Credendino's preceding email:

> We acknowledge receipt of your purchase order and have accepted it. Thank you very much as we work to book the renewal and issue new license keys today. We are queueing up temp keys in case they are needed. We are committed to ensuring no disruption to Macy's operations.
>
> We also want to take this opportunity to address the points raised in your recent communications. As we have stated previously, we disagree with Macy's interpretation that Macy's renewal right includes the right to terminate for convenience. A plain reading of the 2022 Order indicates that the terms and conditions contained within it, including the termination for convenience clause, were intended to apply solely to the initial term of the 2022 Order. Furthermore, the language of the renewal right in the 2022 Order was specifically drafted to stipulate a three-year term for a total price of [REDACTED]. This was predicated on the understanding that Macy's would be committed for the entire three-year term.
>
> We also disagree with any claim that we are leveraging pressure to cut off vital services or to shut down Macy's business. This current situation, as you are aware, has arisen from Macy's end. Macy's has been aware of our expectation regarding

> Macy's commitment to this three-year renewal since April, and it is only now, as the current contract expires today, that Macy's alleges undue pressure.
>
> We look forward to turning our attention to the VCF renewal and establishing our partnership on this critical technology, which will serve Macy's well into the future. We received an email from Shari today about this effort and will work closely with her and your team.

June Emails at 3.

On June 25, 2025, Credendino responded, reserving Macy's rights, and reiterating its position that its renewal right included the TFC right; that CA had not been entitled to remove that right unilaterally; and that CA had forced Macy's to give up that right by refusing even to give Macy's a temporary key. *Id.* at 2.

### C. Procedural History

On October 15, 2025, Macy's filed this lawsuit. Dkt. 1 ("Compl."). It brought one claim: for a declaratory judgment that it had validly renewed the 2022 Order Form, that the Form included a TFC right, and that the 2025 Order Form is invalid and unenforceable because CA procured it unlawfully, by means of economic duress. *Id.* ¶¶ 78–84. On March 4, 2026, the Court held an initial conference and put in place a case management plan anticipating the close of fact discovery on August 31, 2026. Dkt. 22 at 1.

On March 27, 2026, CA moved for judgment on the pleadings, under Federal Rule of Civil Procedure 12(c), Dkts. 24–25, and filed a declaration from Michael J. Reiss, Esq., attaching the June email communications and docket sheets from cases in which courts in this District had acted promptly on applications for emergency relief, Dkt. 27. On April 1, 2026, the Court issued an amend-or-oppose order, notifying Macy's that any amended complaint was due April 14, 2026, and that no further opportunity to amend would ordinarily be granted. Dkt. 29.

On April 14, 2026, Macy's filed the AC, the operative complaint today. Dkt. 32. On April 28, 2026, CA moved to dismiss the AC under Federal Rule of Civil Procedure 12(b)(6),

Dkt. 36, and filed a memorandum of law, Dkt. 37 ("CA Mem."), and a declaration from Reiss with similar attachments, Dkt. 39, in support.

On April 28, 2026, CA moved for a stay of document discovery pending resolution of the motion to dismiss. Dkt. 41. On May 4, 2026, Macy's opposed. Dkt. 44. On May 11, 2026, the Court granted the motion to stay, finding CA to have shown good cause. Dkt. 46. The Court stated that, on its initial review, CA had made a strong showing that its motion to dismiss had merit because courts may void agreements based on claims of economic duress only in "extreme and extraordinary cases," and a party's "reasonable insistence on enforcing its contractual rights 'cannot constitute a wrongful threat sufficient to establish a claim of economic duress.'" *Id.* at 2–3 (internal citation omitted). On the Court's initial review, CA's reading of the 2022 Order Form appeared reasonable, given the form's statement that its "provisions[,] including pricing, [apply] to the initial term only." *Id.* at 3. In light of the scope of anticipated discovery, the Court stated, a stay would conserve significant resources in the event the motion to dismiss were granted. *Id.* at 4. And a stay would not unfairly prejudice Macy's, because its injuries, were it to prevail, would be compensable by money damages. *Id.*

On May 18, 2026, Macy's filed an opposition to the motion to dismiss. Dkt. 49 ("Opp."). On May 28, 2026, CA filed a reply. Dkt. 51 ("Reply").

## II. Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the Court must accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences in the plaintiff's

favor, that tenet is "inapplicable to legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. A complaint therefore is properly dismissed where, as a matter of law, "the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

## III. Discussion

The doctrine of economic duress under New York law "is grounded in the principle that courts 'will not enforce an agreement in which one party has unjustly taken advantage of the economic necessities of another and thereby threatened to do an unlawful injury.'" *Chachkes v. David*, No. 20 Civ. 2879, 2021 WL 101130, at *12 (S.D.N.Y. Jan. 12, 2021) (internal citation omitted). However, because "an element of economic duress is . . . present when many contracts are formed," a plaintiff seeking to invalidate a commercial agreement on grounds of economic duress "bears a heavy burden." *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 123 (2d Cir. 2001); *Zuckerman v. Metro. Museum of Art*, 307 F. Supp. 3d 304, 319 (S.D.N.Y. 2018). A contract "executed between two sophisticated parties will be voided for economic duress only in 'extreme and extraordinary cases.'" *Interpharm, Inc. v. Wells Fargo Bank, N.A.*, No. 08 Civ. 11365, 2010 WL 1257300, at *7 (S.D.N.Y. Mar. 31, 2010) (quoting *VKK Corp.*, 244 F.3d at 123); *see also Davis & Assocs., Inc. v. Health Mgmt. Servs., Inc.*, 168 F. Supp. 2d 109, 116 (S.D.N.Y. 2001) (a finding of duress reflects that "one party to a transaction has been so improperly imposed upon by the other that a court should intervene"); *Nat'l Am. Corp. v. Fed. Republic of Nigeria*, 448 F. Supp. 622, 644 (S.D.N.Y. 1978) (describing duress defense as "traditionally narrow").

A sophisticated party cannot void a contract on the ground of economic duress by showing merely that the "other party knew about and used his or her poor financial condition to

obtain an advantage in contract negotiations." *DuFort v. Aetna Life Ins. Co.*, 818 F. Supp. 578, 582 (S.D.N.Y. 1993). Such a party instead "must show that its agreement was procured by means of (1) a wrongful threat that (2) precluded the exercise of its free will." *Mandavia v. Colum. Univ.*, 912 F. Supp. 2d 119, 127 (S.D.N.Y. 2012) (quoting *Interpharm*, 655 F.3d at 142), *aff'd*, 556 Fed. App'x 56 (2d Cir. 2014) (summary order).

For the reasons that follow, the AC does not plausibly allege either a wrongful threat or a threat that precluded Macy's from exercising free will.

### A. Wrongful Threat

The wrongful threat element of an economic duress claim is construed "strictly." *DuFort*, 818 F. Supp. at 582. A "[m]ere hard bargaining position[] . . . will not be deemed duress." *Mandavia*, 912 F. Supp. 2d at 127. And a "threat to breach a contract, without some further demand," does not "constitute an unlawful threat." *In re 4218 Partners LLC*, No. 19 Bankr. 44444, 2020 WL 4778155, at *4 (Bankr. E.D.N.Y. Aug. 17, 2020); *Interpharm, Inc.*, 2010 WL 1257300, at *9.

Important here, "the threatened exercise of a legal right cannot constitute economic duress." *Worth Constr. Co. v. I.T.R.I. Masonry Corp.*, No. 98 Civ. 2536, 2001 WL 209924, at *7 (S.D.N.Y. Feb. 21, 2001) (internal citation omitted). It is axiomatic that a party cannot be liable for economic duress for "failing to grant further forbearance when [it] had no legal duty to do so." *Davis & Assocs.*, 168 F. Supp. 2d at 114; *Harrison v. Grobe,* 790 F. Supp. 443, 454 (S.D.N.Y. 1992) ("A threat to do that which one has a right to do does not constitute duress." (internal citation omitted)).

That principle protects as well a party who stands on a good-faith interpretation of its legal rights under an agreement. "Under New York law, threats to enforce a party's legal rights under a contract—or even that party's *interpretation* of its rights—cannot constitute a wrongful

threat sufficient to establish a claim of economic duress." *Cooper Dev. Co. v. Friedman*, No. Civ. 7572, 1994 WL 62846, at *4 (S.D.N.Y. Feb. 22, 1994) (emphasis in original), *aff'd*, 43 F.3d 1458 (2d Cir. 1994). Thus, "an action cannot amount to a wrongful threat if the party taking it interprets the contract in good faith to allow it." *Interpharm*, 2010 WL 1257300, at *8.[11] Salient here, too, the existence of a wrongful threat is assessed objectively, based on whether the threatened action said to be coercive "related to a relevant and legitimate dispute which stemmed from the contract itself." *Stewart M. Muller Constr. Co. v. N.Y. Tel. Co.*, 50 A.D.2d 580, 581 (2d Dep't 1975) ("*Muller*"); *see also DuFort*, 818 F. Supp. at 583 ("[T]he existence of a wrongful threat must be evaluated under an objective standard."). As a result, when a party's interpretation of an agreement is objectively "reasonable," its insistence on that interpretation in negotiations does not constitute economic duress. *Davis & Assocs.*, 168 F. Supp. 2d at 116–17. A decisive question in cases of this nature is thus whether the governing agreement objectively gave the party accused of coercion a reasonable basis for the asserted position, or whether that position was a mere pretext to extract a concession for which the party lacked a colorable claim of right.

Here, as reviewed below, CA's reading of the 2022 Order Form—that it did not grant Macy's a TFC right that extended into an ensuing renewal term—was, at a minimum, objectively reasonable. The form's text made CA's position a legitimate one to press with Macy's, as CA

[11] Macy's notes that the principle that asserting a good-faith interpretation of a contract is not a wrongful threat constituting economic duress has not been articulated, to date, by New York's highest courts. Opp. at 16. But the district courts to consider that question have uniformly so held. *See, e.g.*, *Cooper*, 1994 WL 62846, at *4, *Chachkes*, 2021 WL 101130, at *8; *PNC Bank, N.A. v. Dana Transp., Inc.*, No. 16 Civ. 7797, 2022 WL 3701441, at *6 (S.D.N.Y. Aug. 26, 2022), *rev'd and remanded on other grounds*, 2024 WL 4662987 (2d Cir. Nov. 4, 2024) (summary order). And Macy's does not supply any basis to believe that the New York Court of Appeals or the Second Circuit would view a party's good-faith assertion of its contractual rights as wrongful so as to permit a claim of coercion or duress.

did in propounding the 2025 Order Form more than two months before the existing license term expired and in the parties' ensuing emails sparring over the construction of the 2022 Order Form. As reviewed below, the reasonableness of CA's reading is reinforced by the consistency of its interpretation, in contrast to Macy's shifting interpretive methodology. And the AC does not plausibly allege that CA adopted its reading pretextually to attain an unfair advantage. The AC thus does not plausibly plead a wrongful threat by CA.

**1. The Text of the 2022 Agreement**

The parties vigorously dispute the proper construction of the 2022 Order Form. Macy's argues that the agreement granted it a unilateral, one-time option to renew the 2022 Order Form, which "incorporated the 2010 Agreement, as amended in 2019, and included a further amended right for Macy's to terminate the agreement for convenience ("TFC") and receive a pro rata refund of fees paid." Opp. at 1; *see also id.* at 18 ("The 2022 Order Form expressly identified the 2010 Agreement 'as amended' as the 'Governing Contract.'"). Under Macy's construction, the 2022 form "amended the governing 2010 Agreement by replacing the TFC provision that had been added in 2019," making that provision durable. *Id.* at 4. And, by giving timely written notice on February 17, 2025 of its election to renew, Macy's contends, it exercised its renewal option, *id.* at 10–12, thus putting in place for the renewal period "the governing terms in the 2010 Agreement framework, as amended by the TFC amendment in the 2022 Order Form," *id.* at 4.

CA counters by emphasizing the sentence in the 2022 Order Form that preceded the TFC amendment: "[T]he provisions of this [2022 Order Form], including pricing, [apply] to the initial term only." CA Mem. at 5, 14 (quoting 2022 Order Form at 2). The "initial term," it argues, meant the term ending June 18, 2025, an expiration date that the 2022 Order Form references more than 20 times. *Id.* at 4. CA further notes that the renewal provision states: "Following the initial term, Customer may elect to renew this Order Form as a one-time, optional

three (3) year period (the 'Optional Renewal') by providing CA written notice of such election on or before March 18, 2025." *Id.* at 5 (quoting 2022 Order Form at 2). CA also notes that, although the 2022 Order Form set out the fixed price that would govern the renewal period if Macy's opted to renew, it did not comparably identify other terms, including the TFC provision, as carrying forward into the renewal period. *Id.* And, CA asserts, with the parties not having reached agreement on the material terms governing a renewal, it was not obligated to perform after the current term expired. Reply at 6. CA, finally, notes that the 2022 Order Form contained a precedence clause, under which "[a]ny conflict or inconsistency among the parties' agreements is resolved by giving the 2022 form precedence, including over the 2010 Agreement." CA Mem. at 5 (quoting 2022 Order Form at 6).

Macy's rejoins that the 2022 Order Form contained "two types of provisions: those specific to that term, and amendments to the governing 2010 Agreement." Opp. at 18. The TFC provision, it argues, fell into the second category. *Id.* On this reading, the language limiting the 2022 Order Form's provisions to the "initial term" applied only to provisions specific to that term, not to amendments to the underlying 2010 agreement. *Id.*

Were this case a contract-breach action—or a declaratory-judgment action construing the 2022 Order Form while still operative—this Court's responsibility would be to resolve the parties' interpretive debate. To do so, the Court would apply canons of construction to the 2022 Order Form, as relevantly informed by preceding agreements.

The Court's charter in resolving Macy's claim of economic duress here, however, is different. It is to assess merely whether the reading CA pursued with Macy's was objectively reasonable, so as to defeat Macy's claim that CA was wrongful to stand on it.

The answer to that question is clear. The text of the 2022 Order Form absolutely gave CA a legitimate, objectively reasonable basis to assert that Macy's right to renew in June 2025 did not carry with it a TFC provision, such that Macy's claim to have been a victim of economic duress is not plausible or sustainable. *Davis*, 168 F. Supp. 2d at 117. The 2022 Order Form states:

> *The provisions of this document, including pricing, [are applicable] to the initial term only.*
>
> Following the initial term, Customer may elect to renew this Order Form as a one-time, optional three (3) year period (the "Optional Renewal") by providing CA written notice of such election on or before March 18, 2025. If Customer exercises the Optional Renewal, *the total fees for the Optional Renewal shall be* [sealed].

2022 Order Form at 2 (emphases added). That sentence gave CA a legitimate textual hook for its position that the form's "provisions," including the TFC provision, were limited to the "initial term," 2022–2025. And CA repeatedly invoked that provision in its June 2025 emails to Macy's. As noted, other aspects of the 2022 Order Form, including the precedence clause, could be fairly cited as supporting CA's position.

CA's argument to Macy's in standing its ground during the parties' email negotiations, far from being pretextual, was thus overtly textual. As CA summarized its textual explication during the email dialogue in which the parties serially reiterated their competing constructions of the 2022 Order Form: "The scope of the renewal right is limited to specifying a fixed term and a stated price. Nowhere in the renewal right does it state that all other terms and conditions in the 2022 order must be extended into the renewal period." June Emails at 5.

For this reason, CA had a contractual basis—and was not wrongful—to warn Macy's that, absent an executed renewal agreement, it would cease to perform after the 2022 Order Form had expired. The parties had not bridged their divide on whether Macy's right to renew came

with a TFC right; they were at a standstill on that material point.[12] No agreement was in place as to the renewal period. *See, e.g., In re Express Indus. & Term. Corp. v. N.Y. State Dep't of Transp.*, 93 N.Y.2d 584, 589 (N.Y. 1999) ("To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms."); *KJ Roberts & Co. v. MDC Partners Inc.*, No. 12 Civ. 5779, 2014 WL 1013828, at *9 (S.D.N.Y. Mar. 14, 2014) (same). And nothing in the parties' agreements obliged CA to continue to provide software services after the expiration of the existing license if not renewed.

To be sure, Macy's competing construction also appears colorable. And for good reason: The contract documents in this case are not models of clarity. They are amenable to multiple responsible arguments. But the existence of a defensible alternative construction did not make CA's position wrongful. And to the extent that the AC pleads that Macy's construction alone

---

[12] The parties' communications reflect that agreement had not yet been reached on other points as well. Chung's February 17, 2025 Renewal Email, recognized the need for a new order form to address open terms. She stated there that "Macy's *plans to renew* our support services in accordance with our current Broadcom/CA support contract," and sought a renewal document for Macy's "*review and approvals*." Renewal Email (emphases added). As her email reflected, a new order form covering 2025-2028 was needed, including to define whether certain provisions in the 2022 Form would continue into the renewal period or be modified. The preceding order forms, for example, had evolved with respect to various topics, including the risk of loss for hardware components, *compare* 2010 Order Form at 6 *with* 2022 Order Form at 4, and CA's access to Macy's customer data, *compare* 2010 Order Form at 9 *with* 2022 Order Form at 5. And Macy's acknowledges that, after the Renewal Email, material terms "specific to the 2022 Order Form" remained open, including the "consumption license, reporting, product delivery, purchase order, export and personal data modification provisions." AC ¶ 37. To these open issues may be added whether Macy's, at the close of the renewal period in 2028, would have yet another renewal right, and, if so, what the contours of that right would be. Ultimately, the 2025 Order Form that CA circulated on April 9, 2025, and the parties' ensuing emails, brought to light their disagreement on whether the 2022 Order Form had given Macy's a TFC right for the 2025-2028 term. Notwithstanding Macy's expressed desire to exercise its renewal option, the parties' negotiations with respect to a 2025 renewal thereafter foundered as a result of their standoff on that material point.

was viable, *see, e.g.*, AC ¶¶ 70–71, the Court is "not constrained to accept the allegations of the complaint in respect of the construction of the [a]greement." *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995). Instead, the Court is to look to an agreement's text and give "[w]ords and phrases . . . their plain meaning." *PaineWebber Inc. v. Bybyk,* 81 F.3d 1193, 1199 (2d Cir. 1996) (internal citation omitted); *see also Tectrade Int'l Ltd. v. Fertilizer Dev. & Inv., B.V.*, 685 N.Y.S.2d 235, 236 (N.Y. App. Div. 1999) (on a motion to dismiss, the "provisions of the parties' contract 'prevail over the conclusory allegations of the complaint'" (quoting *805 Third Ave. Co. v. M.W. Realty Assocs.,* 58 N.Y.2d 447, 451 (1983))); *2 Broadway L.L.C. v. Credit Suisse First Bos. Mortg. Cap. L.L.C.*, No. 00 Civ. 573, 2001 WL 410074, at *9 (S.D.N.Y. Apr. 23, 2001) (same). Here, the "initial term only" qualifier preceding the TFC provision in the 2022 Order Form made objectively reasonable CA's position that that provision was not guaranteed for the renewal period. CA's disagreement with Macy's thus bespoke a legitimate dispute based on the contract itself, not a threat-making party's wrongful insistence on an unsustainable position.

The assembled case law underscores that CA's threat to stand on a contractual right that it reasonably asserted was not wrongful. Three cases are apposite on this point.

In *Muller*, *supra*, Muller, a construction company, entered into an agreement with the New York Telephone Company to construct the White Plains telephone building. When there was a delay in the work and Muller demanded extra compensation, New York Telephone threatened to terminate the agreement unless Muller signed a revised contract. 50 A.D.2d at 2d 580. Muller did so, but then brought suit, claiming that New York Telephone had known that termination would lead to Muller's "economic collapse" and that its agreement to the revised contract was thus the product of economic duress. *Id.* The Appellate Division reversed the trial

court's denial of New York Telephone's motion to dismiss. It held that New York Telephone's "threat to terminate the contract related to *a relevant and legitimate dispute which stemmed from the contract itself*," and granted its motion for a declaration that the settlement agreement was valid. *Id.* at 581 (emphasis added). The Court of Appeals affirmed. It held that New York Telephone's threat of cancellation in the course of the contractual dispute, while "seeking an accommodation with the financially hardpressed plaintiff," had not been wrongful, because that threat had been anchored in a contractual termination clause. *Stewart M. Muller Constr. Co., Inc. v. N.Y. Tel. Co.*, 40 N.Y.2d 955, 956 (N.Y. 1976).

Similarly, in *DuFort*, *supra*, Judge Freeh dismissed a claim of economic duress based on a party's adherence to a defensible legal position. DuFort, a salesman, had sought benefits under an Aetna Life Insurance Company ("Aetna") disability policy, alleging that a back condition prevented him from working. 818 F. Supp. at 579. After a licensed physician examined him on Aetna's behalf and found that he was not "totally disabled" within the meaning of the policy, Aetna discontinued DuFort's benefits. *Id.* at 582. After an extended dispute, Aetna's representative, Robert Feury, offered DuFort $102,000 to settle his claim on a "take it or leave it basis." *Id.* at 580. DuFort claimed that Feury had orally threatened that, if DuFort chose to go to court, Aetna would "make this thing drag" and DuFort would ultimately be left "homeless and hungry." *Id.* DuFort accepted the settlement but later sued Aetna for full disability benefits, claiming that he had assented to the settlement under economic duress. *Id.* at 581. Judge Freeh entered summary judgment for Aetna. *Id.* at 582–83.[13] He assumed to be true DuFort's account of Feury's statement, which he termed "unnecessarily harsh." *Id.* at 582. But, he held, citing

[13] The docket in *DuFort* does not reflect the filing of a motion to dismiss.

*Muller*, that the decisive question was "whether that statement constituted a 'wrongful threat' as a matter of law." *Id.* (citation omitted). It did not. "Aetna was not the cause of DuFort's financial problems," Judge Freeh noted, and the physician's finding gave Aetna an objective basis to disclaim any obligation to pay DuFort. *Id.* at 582–83. Thus, the parties had a "legitimate dispute" about that obligation, and "Feury's statements amount[ed] to no more than a threat to defend vigorously Aetna's position that it had no liability under the disability policy." *Id.* at 582.

Finally, in *PNC Bank, N.A. v. Dana Transport, Inc.*, No. 16 Civ. 7797, 2022 WL 3701441 (S.D.N.Y. Aug. 26, 2022), Judge Abrams rejected a defense of economic duress based on a threat anchored in a reasonable legal position. The plaintiffs were lenders who had threatened to cease funding loans to a transportation company, Dana Transport, Inc. ("Dana"), unless the company executed additional loan documents and guarantees. *Id.* at *1–3. In defending against the lenders' later action seeking to recover its attorneys' fees,[14] Dana claimed that the lenders' threat had been wrongful and coercive, because the cessation of funding "would have irreparably destroyed [its] businesses." *Id.* at *1, *5. The parties' agreements, however, had permitted the lenders to cease funding and terminate the credit arrangement if Dana was in "default." *Id.* at *6. The lenders asserted that, on the facts known to them, a default had occurred; Dana argued that that assessment had been mistaken. *Id.* Judge Abrams rejected Dana's defense of economic duress, without resolving whether a "default" had been properly assessed under the agreements. *Id.* She noted that "under New York law, threats to enforce a party's legal rights under a contract—*or even that party's interpretation of its rights*—cannot

[14] Dana had sued the lenders on claims arising from the lending relationship and voluntarily dismissed the action, but the lenders incurred substantial legal fees before the dismissal. *PNC Bank*, 2022 WL 3701441, at *3.

constitute a wrongful threat." *Id.* (citations omitted) (emphasis in original). Thus, "even if Lenders' position that Dana was in default was mistaken, its threatened exercise of its rights based on that interpretation . . . cannot, without more, be wrongful." *Id.* Because a legitimate dispute existed and the contract gave the lenders an objectively reasonable basis for their position, their threat to cease funding absent additional loan documents and guarantees had not constituted a wrongful threat. *Id.*[15]

CA's threat here to terminate services upon the expiration of the term covered by the 2022 Order Form is also far afield from the rare cases finding a wrongful threat plausibly pled in cases involving sophisticated economic actors. Two cases illustrate the contrast.

In *KiSKA Constr. Corp. U.S. v. G & G Steel Inc.*, No. 04 Civ. 9252, 2005 WL 1225944 (S.D.N.Y. May 20, 2005), KiSKA won a publicly bid contract with the New York City Department of Transportation to replace the Third Avenue Bridge over the Harlem River. *Id.* at *1. KiSKA contracted with G & G to fabricate and deliver a replacement swing bridge by a specified deadline. *Id.* After G & G failed to perform on time, G & G nonetheless put in claims with KiSKA for "extra" compensation to complete the project and threatened to withhold components necessary to complete the bridge unless KiSKA acceded to or settled those claims. *Id.* at *1–2. KiSKA ultimately entered into a settlement agreement with G & G but later sought to rescind it, claiming economic duress. *Id.* at *2–3. Judge Haight denied G & G's motion to

[15] The economic duress issue in *PNC Bank* was dismissed on a motion for summary judgment. Judge Abrams had denied a motion to dismiss, evidently assessing that resolving Dana's duress defense would require applying the contract's default provision to disputed facts. *Id.* at *4. Here, in contrast, there is no dispute of fact that requires resolution before CA's position can be found reasonable. The dispute about whether Macy's right to renew in 2025 included a TFC provision turns entirely on the terms of the 2022 Order Form. The Court can resolve whether CA's construction was objectively reasonable based on that form and the parties' prior cognizable agreements. It was in recognition of CA's likelihood of success on this point that the Court stayed discovery pending resolution of the motion to dismiss. *See* Dkt. 46.

dismiss. *Id.* at *8. He held KiSKA's complaint to plausibly allege a wrongful threat, because, as G & G conceded, it could not point to anything in the parties' agreement or addendum that supported two of its demands for extras. *Id.* at *7. In contrast, here, CA has pointed to text in the 2022 Order Form that lent objective support to its demand.

*NECEC Transmission LLC v. Campos EPC, LLC*, No. 25 Civ. 5351, 2026 WL 1552350 (S.D.N.Y. June 1, 2026), is readily distinguished as well. There, Massachusetts charged NECEC, a clean-energy–development company, with overseeing construction of a 145-mile transmission line. *Id.* at *1. NECEC contracted with Campos, which subcontracted HDD, to drill and install seven conduits beneath Maine's Kennebec River. *Id.* Mid-project, HDD walked off the job site and shut down operations. *Id.* at *2. Campos threatened to stop working, too, unless NECEC paid it $8 million and executed a change order, increasing the contract price by $14.5 million. *Id.* at *3–4, *8. On these facts, Judge Oetken held, NECEC had pled "a classic claim of economic duress." *Id.* at *8. The governing agreement, he noted, had limited the circumstances in which Campos could seek a change order, required it to provide supporting information for NECEC to evaluate a change order request, expressly permitted NECEC to reject any such request, and unambiguously barred Campos from unilaterally compelling NECEC to accept a change order as a condition of continued performance. *Id.* at *8–9 (rejecting Campos's argument that it was "merely insist[ing] upon [its] legal rights"). The agreement unambiguously barred Campos from unilaterally compelling NECEC to accept a change order as a condition of continued performance. Here, by contrast, the governing agreement does not foreclose CA's asserted position. On the contrary, its "initial term only" provision affirmatively supports CA's interpretation.

### 2. Macy's Evolving Constructions of the 2022 Order Form

The 2022 Order Form thus alone gave CA a textual basis to press its reading of its rights. CA also argues that Macy's oscillation in explaining the basis for its construction—both in its June 2025 email exchanges with CA and in its pleadings here—undermines Macy's argument that the 2022 Order Form's language plainly established its TFC renewal right.

On June 16, 2025, Macy's, via Credendino, asserted to CA that its TFC right arose from the 2022 Order Form's renewal provision. That provision, he stated, extended "all of the terms of the 2022 Order" for an additional three years. June Emails at 5–6. CA's Gressett responded by quoting the sentence on that form which stated, "[t]he provisions of this document, including pricing [are applicable] to the initial term only." *Id.* at 5. In Credendino's email the next day, he refined his articulation. He at that point asserted that the 2010 Order Form, as "amended in 2019 and 2022," governed. *Id.* at 4. As a result of the 2022 amendment, he stated, the 2010 Order Form provided Macy's a TFC right lasting from 2025 to 2028. *Id.* Macy's, he stated, had exercised its right to extend the 2010 agreement "with pricing set forth in our 2022 Order Form." *Id.*

Macy's pleadings reflect a similar shift. Its initial complaint alleged that Macy's renewal had extended all the terms of the 2022 Order Form. Compl. ¶ 36. But its AC, filed after CA's motion for judgment on the pleadings again emphasized the "initial term only" provision of that Form, *see* Dkt. 25 at 1, alleges that Macy's had renewed the 2010 Agreement as amended. *See* AC ¶¶ 37 ("The terms of Macy's right to renew were those in the 2010 Agreement."), 44 ("Macy's had validly exercised its renewal option on the terms of the 2010 Agreement"). And it characterizes the terms introduced by the 2022 Order Form—"pricing, consumption license, reporting, product delivery, payment, purchase order, export, and personal data modification"—as "short-term accommodations" that were "not part of the renewal." *Id.* ¶ 37; *see also* Opp. at 4

(arguing that the 2010 Order Form, as amended by the 2022 form's TFC provision, governed the renewal period, and that the only provisions limited to the 2022–2025 initial term were the "non-amendment provisions").

Macy's of course had every right to refine its interpretation, and its AC governs over its initial Complaint as to its theory of liability. *See Dluhos v. Floating & Abandoned Vessel, Known as "N.Y.,"* 162 F.3d 63, 68 (2d Cir. 1998) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." (cleaned up)); *Phillips v. City of Middletown*, No. 17 Civ. 5307, 2018 WL 4572971, at *4 (S.D.N.Y. 2018) (declining to import claims from the original complaint where amended complaint was filed). But CA is right that the shifts in Macy's interpretive methodology are fair game for comment. *Roman v. City of Mount Vernon*, 21 Civ. 2214, 2022 WL 2819459, at *5–6 (S.D.N.Y. 2022) (amended complaint governs but alterations between original and amended complaint are notable). They underscore a critical point: The governing documents here are knotty. They leave room for multiple objectively defensible interpretations. CA's is among them. As in *Muller*, *DuFort*, and *PNC Bank*, that defeats the allegation that CA's statements standing on that interpretation were wrongful. *See Nat'l Am. Corp.*, 448 F. Supp. at 645 (no wrongful threat where "the threat related to a dispute which stemmed from the contract itself").

### 3. Allegations as to Pretext

A final point as to wrongfulness concerns the absence of well-pled allegations that CA's threat to discontinue its services was pretextual. The AC's claim that CA's insistence on renewal without a TFC provision was "absolutely in bad faith," AC ¶ 44, is anchored in Macy's contention that CA's reading of the 2022 Order Form was indefensible. *See, e.g.*, *id.* ¶¶ 65, 70–71; Opp. at 9 ("A party cannot legitimize a threat to breach by invoking its own—incorrect—contract reading."). The Court, however, has rejected that argument. And the AC does not

allege that CA ever evinced disbelief in the consistent position it took in discussions with Macy's as to the relevant construction of that form, as might have supported a claim of bad faith. *See Oleet v. Pa. Exch. Bank*, 285 A.D. 411, 415 (N.Y. App. Div. 1955) ("mak[ing] improper demands" to which one has "no rightful claim—or a doubtful claim" constitutes bad faith). The timing of CA's first communication of its position to Macy's—April 9, 2025, some 70 days before the expiration of the existing term—was far from last minute, and not indicative of bad faith, either. *See, e.g.*, *Oquendo v. CCC Terek*, 111 F. Supp. 3d 389, 407–08 (S.D.N.Y. 2015) (3 days' notice sufficient to resist demand); *N. Hill Funding of N.Y., LLC v. Maiden & Madison Holdings, LLC*, No. 602997-2009, 2010 WL 2305485, at *3 (N.Y. Sup. Ct. May 3, 2010) (same as to 5 days); *Regent Partners, Inc. v. Parr Dev. Co.*, 960 F. Supp. 607, 609–614, 616 (E.D.N.Y. 1997) (same as to 32 days).[16]

The AC's sole factual allegation bearing on its claim of bad faith that is independent of the contract language is that, "upon information and belief, CA continued to offer termination-for-convenience rights to other customers." AC ¶¶ 44–45. That sparse allegation does not support an inference of bad faith. The AC does not identify any of those customers or the circumstances of their dealings or agreements with CA. Different terms for different customers are consistent with ordinary arm's-length contracting keyed to customers' distinct circumstances. There are sound reasons why a service provider might extend a TFC right to one customer and not another. That other customers bargained for and secured TFC rights does not, without more, plausibly allege bad faith. *See, e.g.*, *Coal. for a Level Playing Field, LLC v. AutoZone, Inc.*, 737 F. Supp. 2d 194, 212 (S.D.N.Y. 2010) ("[A] seller is not obligated to charge the same prices for a

[16] CA also—after Macy's informed CA that it had not expected service to end on the expiration of the current agreement—obtained an exception to its ordinary 48-hour notice requirement and extended Macy's deadline by two days, from June 16 to June 18. *See* June Emails at 7.

commodity if its sales contracts with different buyers contain materially different terms."); *Net2Globe Int'l, Inc. v. Time Warner Telecom of N.Y.*, 273 F. Supp. 2d 436, 446 (S.D.N.Y. 2003) (differential treatment of commercial actors does not establish wrongdoing); *Gas Nat., Inc. v. Iberdrola, S.A.*, 33 F. Supp. 3d 373, 382–84 (S.D.N.Y. 2014) (negotiating alternative terms with third party does not constitute bad faith); *L-7 Designs, Inc. v. Old Navy, LLC*, 964 F. Supp. 2d 299, 307 (S.D.N.Y. 2013) ("Acting in one's financial self-interest, for example, in response to market changes, does not constitute bad faith.").

Macy's allegation of bad faith is, otherwise, conclusory. The Court thus puts it aside. *See, e.g.*, *Ferguson v. Lion Holding, Inc.*, 478 F. Supp. 2d 455, 469 (S.D.N.Y. 2007) ("[C]onclusory allegations of a party's failure to act in good faith alone are insufficient; specific factual allegations of a party's bad faith acts are required."); *Chachkes*, 2021 WL 101130, at *11 (same); *Silverberg v. SML Acquisition LLC*, No. 15 Civ. 7129, 2017 WL 758520, at *7 (S.D.N.Y. Feb. 27, 2017) (dismissing economic duress claim and rejecting bad faith arguments for lack of "evidence suggesting that Defendants acted in bad faith in believing they could void" an agreement).

The AC accordingly has not plausibly pled a wrongful threat by CA.

### B. Exercise of Free Will

A plaintiff claiming economic duress must plead not only a wrongful threat, but also that the threat itself "precluded it from exercising its free will at the bargaining table." *Interpharm*, 2010 WL 1257300, at *10. Courts addressing this point consider whether the plaintiff (1) "would have suffered 'irreparable harm' had the wrongful threat been carried out," and (2) "was bereft of alternatives to signing the contract." *Id.* Here, the AC does not plausibly allege that Macy's—a Fortune 500 company that during its standoff with CA had ready access to

counsel and the courts in this District—was "bereft of alternatives to signing" the unwanted 2025 Order Form. *Id.*; CA Mem. at 3.

The AC pleads that Macy's staff noticed CA's "ominous countdown clock" on June 10, 2025, alerting Macy's that its software access would be revoked in eight days. AC ¶ 54. On that basis, Macy's briefing on this element focuses on that eight-day period. It contends that, during the two months between April 9 and June 10, it believed that it had already renewed pursuant to "a binding agreement" that gave it a TFC right during the renewal period, and that CA was merely trying to "re-trade [the] existing terms." *Id.* ¶ 49. But, the AC pleads, once the countdown clock appeared and CA's Gressett the next day made CA's reading of the 2022 Order Form explicit, Macy's grasped its predicament. *Id.* ¶¶ 55–56. At that point, it pleads, Macy's lacked "viable alternatives to [the] CA mainframe software" on which its operations were dependent, as "[s]ubstitute providers either did not exist or could not be implemented" on the "compressed timeline" before CA's service terminated. *Id.* ¶ 72.

At the threshold, the critical premise of Macy's argument—that only the eight days between June 10 and 18 are relevant in assessing its alternatives to signing the 2025 Order Form—is in tension with facts pled in the AC. Macy's asserts that, until June 10, it believed it had executed a binding renewal agreement that guaranteed it TFC rights. On that basis, it argues that, in evaluating its alternatives to acceding to CA's 2025 Order Form, the Court must consider only its options during the following eight days. But the AC and the materials cognizable under it belie Macy's portrait of the two preceding months. Macy's February 17 Renewal Email itself did not claim to put in place a binding agreement. *See* Renewal Email. It acknowledged the need for the parties to review and agree upon various outstanding terms. *Id.* The AC does not plead that the parties ever reached an agreement on these. *See supra* note 12. To the same

effect, CA's McWhorter's email on April 9 that attached the 2025 Order Form asked when Macy's would like to "schedule some time to renew." *See* Feb/April Emails at 2. Moreover, as to Macy's claim that until June 10, it believed there was a meeting of the minds as to renewal, the 2025 Order Form exposed the parties' chasm as to a TFC provision. It also warned Macy's that the "pricing and terms offered herein expire unless Customer executes and delivers this Order Form" before June 19. *See* 2025 Order Form at 8. Under the 2022 Order Form, Macy's software license was to expire "on June 18, 2025." *See* 2022 Order Form at 1, 5.

Whatever Macy's certitude that it was entitled to renew with a TFC right, these assembled communications objectively put Macy's on ample notice, no later than April 9, of three critical propositions: (1) The parties had not reached agreement on the material terms of a 2025 renewal; (2) absent an agreement, Macy's, after June 18, would not have an extant agreement in place to license CA's software, and (3) reaching an agreement by that date could not be taken for granted, given the parties' diametric positions as to a TFC provision for the renewal term. *See* AC ¶ 46 (Macy's "promptly [after April 9] responded[,] rejecting CA's unilateral attempt to modify the termination provision and insisting that the 2022 Order Form and 2010 Agreement terms continue to govern").

The AC, however, does not plead that, between April 9 and June 10, Macy's took any action other than "engaging in discussions with CA regarding CA's proposed modifications." *Id.* ¶ 49.[17] It does not plead that Macy's consulted outside counsel, sought (or even explored

[17] The AC does not plead any details as to the content of these discussions, save that Macy's viewed these as "ongoing business discussions with a long-term contractual partner concerning a potential re-trade of existing terms." AC ¶ 49. The AC does not plead that, in these discussions, CA ever conceded that Macy's construction of the 2022 Order Form was correct or that CA assured Macy's that it would continue to provide its services after June 18 in the absence of an executed renewal form.

seeking) judicial relief, or contacted (or even considered contacting) an alternative software provider.

In light of these pleadings, the straits in which Macy's found itself on June 10—without a forward-looking agreement with its longtime provider of existentially critical software services, in disagreement with that provider as to at least one key term of a potential contract renewal, without having secured or even approached an alternative software provider, and without having taken any step towards securing legal relief—were substantially of Macy's own making. *See, e.g.*, *Interpharm*, 2010 WL 1257300, at *10–12 (no deprivation of free will where party failed to pursue alternatives to signing contract); *Davis & Assocs.*, 168 F. Supp. 2d at 115–17 (same); *Mandavia*, 912 F. Supp. 2d at 128–29 (same); *In re 4218 Partners*, 2020 WL 4778155, at *5–6 (same). Put simply, between April 9 and June 10, Macy's had constructive if not actual "notice of the problems looming on the horizon," *Davis & Assocs.*, 168 F. Supp. 2d at 117 (citation omitted). Yet it stood pat and put all its eggs in one basket, evidently assuming it would reach an entente with CA. On the pleadings, CA did not coerce Macy's to view its recourses in this myopic fashion during those two months. That was Macy's choice.

Even treating June 10 as the starting date for assessing Macy's alternatives—based on the AC's implication that CA had not before then told Macy's of its reading of the 2022 Order Form and its allegation that Macy's only learned that day that software services would shut off upon expiration of the current license—the AC still does not plausibly allege that Macy's only option was to sign the 2025 Order Form. In the ensuing eight-day window, Macy's had an obvious avenue of recourse: It could have filed suit and sought emergency relief, such as a temporary restraining order or a preliminary injunction. *See Chachkes*, 2021 WL 101130, at *12 ("The ordinary answer if a party believes its rights are being violated is to sue."); *Silverberg v. SML*

*Acquisition LLC*, No. 15 Civ. 7129, 2017 WL 758520, at *8–9 (S.D.N.Y. Feb. 27, 2017). Macy's in fact implicitly threatened CA with legal action late in that period. On June 16, 2025, Credendino warned CA that if it continued to take a position Macy's viewed as breaching the 2022 Order Form, Macy's would "have no choice but to explore all available legal options." June Emails at 6. But Macy's did not put those words to action. It did not file suit. It did not pursue emergency relief. Indeed, the AC does not allege that, before executing the 2025 Order Form, Macy's in fact explored its legal options.

The AC instead justifies Macy's inaction with a series of conclusory statements. It states that it lacked a "practical ability to seek and obtain alternative or judicial relief" because "rushed legal action" risked a "shutdown of its operations." AC ¶ 60. It characterizes injunctive relief as "impractical given the compressed timeline." *Id.* ¶ 73.

Those arguments are facially implausible. In the 2010 Subscription Agreement, Macy's and CA selected the federal and state courts in this District as the exclusive forum for their disputes and agreed that New York law would govern these disputes. 2010 Subscription Agreement at 12. Macy's thereby was assured that any claim it brought would be heard in a commercially sophisticated forum whose judges have long been known for responding—and demonstrably have responded—with dispatch to applications for emergency relief, including in business cases presenting in urgency. *See 159 MP Corp. v. Redbridge Bedford, LLC*, 33 N.Y.3d 353, 359 (N.Y. 2019) (describing "New York's status as the preeminent commercial center in the United States, if not the world," and how its "courts have long deemed the enforcement of commercial contracts" an integral part of New York law); Barry R. Ostrager, *New York's Commercial Division: The Premier Forum for the Resolution of International Business Disputes*,

N.Y. STATE BAR ASS'N J., May 2020, at 16–19 (global business community designates New York as forum for commercial dispute resolution due to its sophistication and efficiency).

Examples of courts in this District acting expeditiously on requests for emergency relief are legion. A small subset of recent examples includes:

- In *CoBank, ACB v. Cable One, Inc.*, a lender sought emergency injunctive relief to prevent a telecommunications company from completing a $480 million acquisition, alleging that the transaction would constitute a constructive fraudulent transfer. Judge Oetken, sitting in Part I, granted a temporary restraining order the day the application was filed. *See* No. 26 Civ. 8935 (VM), Dkts. 9, 11, 13 (S.D.N.Y. Oct. 9, 2026).

- In *Chicago Title Insurance Co. v. Earnspark Global Concerns*, a title insurer sought emergency relief after funds wired in connection with a real estate refinancing transaction were allegedly fraudulently diverted to a third-party bank account. Judge Subramanian granted a temporary restraining order freezing the funds and authorizing expedited discovery the day the application was filed. *See* No. 26 Civ. 1155 (AS), Dkts. 3, 9 (S.D.N.Y. Feb. 11, 2026).

- In *Fleming Intermediate Holdings LLC v. James River Group Holdings Ltd.*, Fleming sought emergency relief to prevent the expiration of a contractual purchase-price adjustment process before James River produced information necessary to calculate the adjustment. Judge Rochon temporarily stayed the process the same day the emergency motion was filed. *See* No. 24 Civ. 5335 (JLR), Dkts. 10–11, 17 (S.D.N.Y. July 29, 2024).

- In *U.S. Specialty Insurance Co. v. Lead Name of Certain Underwriters at Lloyds London*, an insurer sought emergency injunctive relief to prevent other insurers from exhausting the limits of certain insurance policies through settlements with third parties. This Court considered and denied the application on the day it was filed. *See* No. 25 Civ. 5466 (PAE), Dkts. 8, 11, 12 (S.D.N.Y. Aug. 15, 2025).

- In *Yes I Can Licensed Behavioral Analyst PLLC v. Green Tree Cap., LLC*, behavioral-health businesses sought emergency injunctive relief to prevent the enforcement of judgments arising from an allegedly predatory merchant cash-advance agreement. This Court considered, but denied, the initial *ex parte* application the day it was filed. *See* No. 24 Civ. 7360 (PAE), Dkts. 7, 9 (S.D.N.Y. Oct. 1, 2024).

- In *CVI CVF V Pooling Fund I LP v. Société Générale S.A.*, an investment fund sought emergency relief to prevent a bank from honoring an allegedly fraudulent draw on a standby letter of credit. Judge Furman granted a temporary restraining order one day after the application was filed. *See* No. 24 Civ. 1504 (JMF), Dkts. 6, 11 (S.D.N.Y. Feb. 27–28, 2024).

- In *Rag & Bone Holdings, LLC v. Miramar Brands Group, Inc.*, a fashion company sought emergency injunctive relief to prevent another company from interfering with its sale and distribution of merchandise bearing the name "Miramar." Judge Schofield held a hearing the day after the application was filed and granted the temporary restraining order that day, issuing a written order the following day. *See* No. 25 Civ. 9937 (LGS), Dkts. 8–9, 14, 20 (S.D.N.Y. Dec. 1–3, 2025).

- In *Citibank, N.A. v. Brigade Capital Management, LP*, Citibank sought emergency injunctive relief to prevent an investment manager from transferring or disposing of nearly $175 million that Citibank had mistakenly wired to lenders of Revlon and that the manager had refused to return. Judge Furman granted a temporary restraining order freezing the funds one day after the application was filed. *See* No. 20 Civ. 6539 (JMF), Dkts. 5, 9, 25 (S.D.N.Y. Aug. 17–18, 2020).

- In *New York v. Noem*, New York sought emergency injunctive relief to prevent the Department of Homeland Security and FEMA from reallocating approximately $49.8 million in federal counterterrorism funding intended for New York's transit systems. Judge Kaplan granted a temporary restraining order one day after the application was filed. *See* No. 25 Civ. 8106 (LAK), Dkts. 2, 12 (S.D.N.Y. Sep. 30–Oct. 1, 2025).

- In *Jane Street Group, LLC v. Millennium Management LLC*, Jane Street sought a temporary restraining order to prevent a competitor and two former employees from allegedly misappropriating its proprietary trading strategies. This Court held an emergency hearing and denied the application two days after it was filed. *See* No. 24 Civ. 2783 (PAE), Dkts. 6, 32 (S.D.N.Y. Apr. 17–19, 2024).

- In *TM Motorhome Sales, LLC v. Turri & Boari SNC*, a motorhome distributor sought emergency injunctive relief arising from a dispute over an exclusive distributorship agreement with an Italian manufacturer. Judge Failla granted a temporary restraining order two business days after the application was filed. *See* No. 26 Civ. 3132 (KPF), Dkts. 6, 21 (S.D.N.Y. Apr. 16–20, 2026).

- In *First-Citizens Bank & Trust Co. v. Patriot Bank, N.A.*, a bank sought emergency injunctive relief in a complex contractual dispute involving several financial institutions. Judge Rakoff granted the application in part within two days of its filing and scheduled an evidentiary hearing on the request for a preliminary injunction for the following week. *See* No. 26 Civ. 3810 (JSR), Dkts. 7–8, 20 (S.D.N.Y. May 11–13, 2026).

- In *Bajaj Gas & Convenience, Inc. v. BP Products North America Inc.*, a gas-station and convenience-store operator sought emergency injunctive relief against a petroleum supplier in a dispute involving contractual and statutory rights arising from their business relationship. Following removal of the action from state court, Judge Halpern held an expedited hearing and entered a temporary restraining order two days after removal. *See* No. 24 Civ. 4849 (PMH), Dkts. 10, 14, 16 (S.D.N.Y. June 26–28, 2024).

- In *Better Home & Finance Holding Co. v. Garg*, a mortgage-finance company sought emergency injunctive relief against its former CEO, alleging that he had made misleading securities disclosures and improperly solicited shareholder support in an effort to regain control of the company. Judge Garnett, sitting in Part I, held an expedited hearing and denied the application for a temporary restraining order and preliminary injunction three days after the hearing. *See* No. 26 Civ. 7025 (CM), Dkts. 32, 36 (S.D.N.Y. Aug. 25–28, 2026).

Here, there were ready litigation options available to Macy's between June 10 and 18. Most obviously, Macy's could have filed an action for declaratory and injunctive relief as to its right under the 2022 Order Form to renew with a TFC provision, while seeking emergency relief enjoining CA from denying it software services pending resolution of the action. Based on the facts pled in the AC, Macy's would have had a compelling basis to claim irreparable harm, the most important ingredient of a temporary restraining order. *See Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) ("A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" (internal citation omitted)); AC ¶ 60 (alleging potential for irreparable harm if Macy's lost CA's services). And to cover its bases in the event the Court denied (or failed to act on) the TRO, Macy's could have done what it did anyway: sign the 2025 Order Form under protest.

Macy's failure to pursue a litigation option—or to explain, other than conclusorily, why pursuing that avenue would have been futile—disposes of its claim that, when it signed the 2025 Order Form, it did so bereft of alternatives and lacking free will. *See, e.g.*, *Great Lakes Reinsurance UK SE v. Herzig*, No. 16 Civ. 9848, 2020 WL 7080975, at *4 (S.D.N.Y. Aug. 25, 2020) (dismissing economic duress claim where plaintiff could have sought a preliminary injunction but did not do so); *In re 4218 Partners*, 2020 WL 4778155, at *5–6 (dismissing economic duress claim that party had "no choice" but to execute loan documents; court notes that plaintiff failed to plead "enough facts to support its position that there were no adequate alternative remedies" because the test is "not whether the [p]laintiff would have fully recovered

its alleged damages, but whether the legal remedy was available and adequate"); *Mandavia*, 912 F. Supp. 2d at 128–29 (dismissing economic duress claim where "[p]laintiff undoubtedly had options other than signing the Agreement, such as pursuing his legal remedies"); *Davis & Assocs.*, 168 F. Supp. 2d at 115–17 (dismissing economic duress claim where defendant had not made a wrongful threat, but even if it had, plaintiff had not been deprived of free will because it had been on notice for 30 days that its funding might be threatened, but neither sought alternative funding nor pursued legal process); *Nelson v. Stanley Blacker, Inc.*, 713 F. Supp. 107, 110 (S.D.N.Y. 1989) (dismissing economic duress claim where resort to legal remedies would not "have been impossible when the threat was made").

As to the preclusion of free will element, too, the cases to have sustained duress claims are readily distinguished.

In *Austin Instrument v. Loral Corp.*, the paradigmatic case of economic duress under New York law, Austin threatened to cease delivering parts necessary for Loral's production of Navy radar sets unless Loral agreed to substantial price increases and awarded Austin the precision-gear work under a second Navy contract, and soon after ceased making deliveries. 29 N.Y.2d 124, 128–29 (N.Y. 1971). In response, Loral "feverishly" contacted 10 government-approved precision-gear manufacturers but found none capable of producing the specialized parts in time to meet Loral's obligations to the Navy, which entailed making parts necessary for "highly sophisticated . . . military machinery" and which had to be manufactured to the "strictest engineering standards." *Id.* at 129, 133. Only then did Loral accede to Austin's demand. *Id.* at 133. In holding that Austin's threat deprived Loral of its free will, the New York Court of Appeals noted that Loral had contacted all the government's approved vendors before acceding. *Id.* at 132. It also noted the significance of Loral's military contracting work, and that failure to

deliver on time would expose Loral to liquidated damages and the potential loss of its government contracting capacity. *Id.* at 131–33. And normal legal remedies, the Court of Appeals found, were "inadequate under the circumstances." *Id.* at 133. On these facts, it held, Loral "actually had no choice" but to accept Austin's terms. *Id.*

The facts pled in the AC here are not comparable. It does not plead why legal remedies were inadequate to protect Macy's interests. And Macy's outreach to an unnamed third-party provider and its inquiry into a temporary key, AC ¶ 59, are a far cry from Loral's "feverish" efforts to secure an alternative contractor.

*KiSKA*, reviewed above, is inapposite on this element for similar reasons to those noted in *Austin*. As Judge Haight there emphasized in sustaining the duress claim, G & G's threat of nonperformance not only endangered KiSKA's construction business, reputation, and ability to obtain future public contracts, and exposed it to potential sanctions—it also put at risk an ongoing municipal infrastructure project and endangered public safety. 2005 WL 1225944, at *2, *5. KiSKA also plausibly pled that even if it had resorted to legal (contract damage) remedies, it would have incurred millions of dollars in extra costs, including liquidated damages to the government for missed deadlines, *id.* at *5, *7, and that, in any event, it could not obtain "the promised goods and services from another source," *id.* at *7.

Finally, *NECEC Transmission*, also reviewed above, likewise emphasized the project's nexus to the public in finding the threatened contractor to have pled a lack of free will. Campos had threatened, if NECEC did not agree to up the project price, not only to stop work on the pipeline project but also to remove the bore-hole casing in place. 2026 WL 1552350, at *3. That would have collapsed the bore hole, "potentially dooming the project" and forcing a successor contractor to start from scratch, on a project in which NECEC was constructing a

transmission line to supply New England with hydroelectric power. *Id.* at *3, *8. In these circumstances, Judge Oetken held, the interests of the government and the public bear on whether a threatened party lacked free will. *Id.* at *8–9. The AC here does not plead any comparable public interest considerations.

The AC thus does not plausibly plead the second element of an economic-duress claim: that CA's threat to terminate software services on the expiration of the existing license precluded Macy's from exercising its free will. For this reason, too, the AC does not state such a claim.

**IV. Dismissal with Prejudice**

Macy's asks that, in the event of dismissal, it be granted leave to amend. Whether to do so is "a matter committed to the Court's 'sound discretion' and a 'district court has discretion to deny leave for good reason, including futility.'" *Westbrooke v. Bellevue Hosp. Ctr.*, No. 16 Civ. 9845, 2019 WL 233611, at *2 (S.D.N.Y. Jan. 16, 2019) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)).

The Court denies leave to amend, and dismisses the AC with prejudice, for three reasons.

First, Macy's has already amended once, and was warned then not to expect a further opportunity to amend. Following CA's Rule 12(c) motion, the Court afforded Macy's an opportunity to amend in response, while notifying Macy's that a further opportunity to amend would ordinarily not be granted. Dkt. 29. The Second Circuit has repeatedly affirmed dismissals with prejudice where a plaintiff, having amended in response to a motion to dismiss, failed to cure the identified deficiencies. *See, e.g.*, *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 506 (2d Cir. 2014); *Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007); *Off. Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 168 (2d Cir. 2003); *Denny v. Barber*, 576 F.2d 465, 471 (2d Cir. 1978).

Second, Macy's has not identified any additional allegations that could cure the AC's pleading deficiencies. Leave to amend is not warranted "[a]bsent some indication as to what appellants might add to their complaint in order to make it viable." *Nat'l Union of Hosp. & Health Care Emps. v. Carey*, 557 F.2d 278, 282 (2d Cir. 1977). Macy's states that an amendment would be in good faith. Opp. at 25. But it does not identify any fact that might salvage its claim. The "fail[ure] to disclose what additional allegations [Macy's] would make which might lead to a different result" supports denial of leave to amend. *Horoshko v. Citibank, N.A.*, 373 F.3d 248, 249–50 (2d Cir. 2004); *Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 276 (2d Cir. 2006) (per curiam) (affirming denial of leave to amend because "plaintiff's counsel did not advise the district court how the complaint's defects would be cured").

Third, given the bases for dismissal, the Court cannot discern a realistic prospect that a new amendment could rehabilitate Macy's claims. The Court's basis for not finding a wrongful threat was anchored in the text of the 2022 Order Form, which afforded CA a reasonable basis to dispute that Macy's 2025 renewal came with a TFC right. That text is durable. An amendment to the AC cannot change it. And the Court's basis for not finding the preclusion of Macy's free will was anchored in Macy's failure to pursue legal relief. That, too, is a stubborn fact. Amendment would be futile because these deficiencies are substantive—not the product of inadequate pleading. *See, e.g.*, *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 549 (S.D.N.Y. 2015) (denying leave to amend where there is "no realistic prospect of rehabilitating plaintiff's federal claims"); *Long Miao v. Fanua, Inc.*, 442 F. Supp. 3d 774, 808 (S.D.N.Y. 2020) ("Where the problems with a claim are 'substantive' rather than the result of an 'inadequately or inartfully pleaded' complaint, an opportunity to replead would be 'futile' and 'should be denied.'" (quoting *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000))); *Gilliam v. Greenberg Traurig LLP*, No.

23 Civ. 6144, 2024 WL 4043348, at *7 (S.D.N.Y. Sep. 4, 2024) (denying leave to amend where it would be futile); *F5 Cap. v. Pappas*, 856 F.3d 61, 88–90 (2d Cir. 2017) (same).

## CONCLUSION

For the reasons above, the AC does not plausibly plead the "extreme and extraordinary" circumstances under which a sophisticated party may void its contractual obligations based on a claim of economic duress. *VKK Corp.*, 244 F.3d at 123. The Court accordingly dismisses the AC with prejudice. The Clerk of Court is respectfully directed to terminate the motion pending at docket 36, and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: October 22, 2026
New York, New York